UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

T<small>IFFANY</small> G<small>ERALD</small>,

    Plaintiff,

v.

N<small>ICO</small> H<small>URD</small>, <small>ET AL</small>.,

    Defendants.

_____/

Case No. 17-12850

S<small>ENIOR</small> U.S. D<small>ISTRICT</small> J<small>UDGE</small>
A<small>RTHUR</small> J. T<small>ARNOW</small>

U.S. M<small>AGISTRATE</small> J<small>UDGE</small>
E<small>LIZABETH</small> A. S<small>TAFFORD</small>

**O<small>RDER</small> G<small>RANTING IN PART AND</small> D<small>ENYING IN PART</small> D<small>EFENDANTS</small>' M<small>OTION FOR</small> S<small>UMMARY</small> J<small>UDGMENT</small> [31]**

On August 29, 2017, Plaintiff Tiffany Gerald, through counsel, commenced this 42 U.S.C. § 1983 action alleging violations of her Fourth Amendment rights after Detroit Police Department ("DPD") officers raided her home and killed her dog. Before the Court is Defendants City of Detroit, Nico Hurd, Samuel Pionessa, and Samuel Galloway's Motion for Summary Judgment [31] filed on April 18, 2018. The Motion is fully briefed. The Court held a hearing on the Motion on February 7, 2019.

For the reasons explained below, the Court **GRANTS** Defendants' Motion with respect to Counts III, IV, V, and VI. The Court **DENIES** Defendants' Motion with respect to Count II because the issue of whether Defendant Galloway

reasonably believed that Plaintiff's dog posed an immediate threat to his safety under the circumstances is a fact question for the jury.

## FACTUAL BACKGROUND

On May 31, 2017, DPD received information, from an unidentified source, that drugs were being sold at 20226 Archdale in Detroit, Michigan. Based on that information, Defendant Officer Samuel Galloway and non-party officer Johnny Fox met with SOI #3058 to plan a controlled buy at the location. Later that day, Officers Galloway and Fox conducted surveillance on the house while SOI #3058 performed the controlled buy. Galloway watched SOI #3058 purchase marijuana from a black male, age 35-40, 6'2, and approximately 170 pounds. After purchasing the marijuana from the suspect, SOI #3058 gave it to Galloway. Based on a PeopleMap Report matching the suspect's description, the officers believed that a person by the name of Deshon Leon Stanley was the seller. Defs.' Ex. D. Plaintiff Tiffany Gerald—Deshon Stanley's girlfriend—owns the home at 20226 Archdale.

Galloway, who had witnessed the controlled buy, wrote an affidavit for a search warrant of the premises. On June 1, 2017, the Magistrate Judge and prosecutor signed the warrant.

On June 2, 2017, at approximately 3:00 PM, the Major Violators Crew, which included, among others, Officers Galloway, Samuel Pionessa, and Nico Hurd ("Defendant Officers"), executed the search warrant. After announcing their

presence and purpose, the officers busted open the front door. Galloway, as "point man," entered the home first. Upon entry, he encountered a pit bull. Galloway testified that the dog was barking, growling, and showing its teeth. Galloway and Pionessa further testified that the dog was charging at Galloway and that Galloway commanded the dog to get back. Galloway fired two shots with his AR-15, killing the dog.

Thereafter, the remaining officers entered, and began clearing, the house. Pionessa encountered a second pit bull which he secured in the bathroom. No one was home. The owner, Ms. Gerald, was at work.

While the officers continued with their search, Stanley, the suspect described in the search warrant, was next door with Ms. Gerald's neighbor, Charles McKnight. McKnight, a mechanic, lives immediately next door to Ms. Gerald and had been working on Stanley's vehicle that day. Stanley and McKnight called Ms. Gerald to inform her that the police were raiding her home and had shot her dog. From outside of his home, McKnight began to record the raid on his phone.

Ms. Gerald left work and drove home. When she arrived, she saw the officers searching her house. She asked what was going on and whether they had a warrant. She testified that a tall, white officer grabbed her, put her in handcuffs, and led her up to the front door. Pl.'s Dep. 16:10-14, Jan. 29, 2018. She saw her dog, Hazel, lying in a pool of blood on her living room floor and screamed "you killed my dog!"

The officers led her into the kitchen and ordered her stand facing the wall for approximately thirty minutes while they continued the search. After ransacking the entire house, the officers found 0.9 grams of marijuana in a knotted bag, a red grinder, and plastic bags in the kitchen.

Ms. Gerald was issued a citation for Operation of Place of Illegal Operation and released. On August 23, 2017, the 36th District Court dismissed the criminal charges against Ms. Gerald.

Defendants filed this Motion for Summary Judgment [31] on April 18, 2018. On May 9, 2018, Ms. Gerald filed a Response [33] in which she voluntarily dismissed Count I. Defendants filed a Reply [36] on May 16, 2018. The Court held a hearing on the Motion on February 7, 2019.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Plaintiff must "go beyond the pleadings and by . . . affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

### I. Dog Shooting (Count II)

Plaintiff alleges that Defendant Galloway's execution of Hazel violated her Fourth Amendment right to be free from an unreasonable seizure of her dog.

Defendant Galloway is entitled to qualified immunity unless Plaintiff presents sufficient evidence to create a genuine dispute of material fact as to whether (1) Galloway violated a constitutional right (2) that was clearly established such that a reasonable person in his position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

Defendants concede that, in the Sixth Circuit, it is clearly established that the Fourth Amendment protects Plaintiff against an unreasonable seizure of her dog. *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566-67 (6th Cir. 2016). Accordingly, at issue here is solely whether Galloway's use of deadly force against Hazel was reasonable. *Id.* at 567. In *Brown*, the Sixth Circuit held:

> [A] police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under

> the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety.

*Id.* at 568.

The Court analyzes the question of whether a dog constitutes an imminent threat "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 567 (quoting *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016)).

Defendants argue that Galloway is entitled to qualified immunity. They note that prior to making entry, Galloway and his team were unaware that there might be dogs in the house. Galloway testified that when he entered the home, a pit bull was charging at him, showing its teeth, and behaving aggressively. He further testified that he commanded the dog to "get back" before firing. Pionessa, the Sergeant who followed Galloway into the house, corroborated Galloway's testimony about Hazel's behavior.

Plaintiff acknowledges that she was not present at the beginning of the raid, and therefore, did not see Hazel immediately before Galloway fired the fatal shots. Nonetheless, Plaintiff submits that summary judgment is inappropriate because Galloway is not credible. Prior to June 2, 2017, Galloway had already killed 18 other dogs, which suggests that he had a reason to lie about Hazel's behavior at his deposition. Plaintiff further submits that Hazel had never behaved aggressively

toward visitors in the past and was recovering from surgery on the day of the raid. *See* Pl.'s Dep. 34:18-19; 35:13-15.

Viewing the facts in the light most favorable to Plaintiff, this Court cannot conclude, as a matter of law, that Galloway reasonably believed that Hazel posed an imminent threat to his safety. Hazel was a 50-pound dog who had never behaved aggressively towards visitors. Her ears were not cropped. Notably, the day prior to the raid, she had been spayed. Given that Hazel was recovering from surgery, a jury could infer that she was weak, slow, and unable to lunge aggressively. More importantly, the fact that Hazel was recovering from surgery rebuts Galloway's assertion that she posed a threat to his safety. *See Brown*, 844 F.3d at 570.

A jury could reasonably conclude that Galloway's history of violence against dogs, coupled with his testimony in this case and other related cases, undermine his credibility. Whether Galloway reasonably believed that Hazel posed an imminent threat to his safety under these circumstances is a question for the find-finder. Accordingly, summary judgment on Count II is unwarranted.

## II. Validity of the search warrant (Count III)

In Count III, Plaintiff alleges that Defendant Officers unlawfully entered her home based on knowingly false affidavit. A warrant must be voided if (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "with the affidavit's false

material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

Plaintiff must make "a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003). "Only if she clears that hurdle do we proceed to *Franks*'s second step." *Newell v. Wayne Cnty.*, 733 F. App'x 286, 290 (6th Cir. 2018).

Plaintiff maintains that Galloway lied and signed a false affidavit to establish probable cause for the search warrant. But this blanket assertion hardly amounts to a "substantial showing" that Galloway "stated a deliberate falsehood" or "showed reckless disregard for the truth." *See id.* at 292 (noting that *Franks* requires more than a conclusory attack). As Defendants appropriately note, Plaintiff has not presented any objective evidence to support this conclusory allegation.[1] Stanley's

---

[1] At the hearing, Plaintiff's counsel requested disclosure of SOI #3058, the confidential informant who performed the controlled buy at 20226 Archdale. The Court informed counsel that it would consider the request, excusing the need to file a motion to compel. Having reviewed the record, the Court concludes that Plaintiff has failed to satisfy the "formidable burden in establishing a justification for overriding the [informer's] privilege." *Holman v. Cayce*, 873 F.2d 944, 946-47 (6th Cir. 1989) (noting that the informer's privilege allows the Government "to withhold from disclosure the identity of persons who furnish to law enforcement personnel information concerning violations of law."). Because fair determination of Plaintiff's claims does not rest on disclosure of the SOI's identity, the Court denies counsel's request.

Affidavit which attests that he did not visit Plaintiff's house on the day of the controlled buy, without more, is insufficient to create a genuine issue of material fact as to whether Galloway lied. *Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 573 (6th Cir. 2018) (noting that "unsubstantiated, self-serving assertions will not preclude an adequately supported motion for summary judgment from being granted."). Because Plaintiff has failed to offer any evidence to support her claim that Galloway fabricated the controlled buy, the Court grants summary judgment on Count III.

### III. False arrest (Count IV)

Plaintiff alleges that Defendant Officers lacked probable cause to detain her while executing the search warrant in violation of her Fourth Amendment rights. Though labeled a false arrest claim, the Court construes Count IV as an excessive force claim. *See Burchett v. Kiefer*, 310 F.3d 937, 946 (6th Cir. 2002) (noting that "claims of excessive force do not necessarily require allegations of assault, but rather can consist of the physical structure and conditions of the place of detention.").

"[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Mich. v. Summers*, 452 U.S. 692, 705 (1981). The Sixth Circuit authorizes detention, however, "using only the least intrusive means

reasonably available." *Binay v. Bettendorf*, 601 F.3d 640, 652 (6th Cir. 2010) (internal citations and quotation marks omitted).

"The relevant question here is whether the amount of force that the officers used to secure and detain Plaintiff[] was objectively reasonable given the circumstances of this search." *Id.* at 650 (considering factors including whether the plaintiffs: had criminal records, cooperated, posed an immediate threat, and attempted to resist or flee).

Plaintiff testified that when she pulled up to the house, she was immediately handcuffed upon exiting her car. She further testified that the arresting officer used force to effectuate the arrest which caused bruising. The officers led her into the kitchen, where she was required to stand facing the wall, in handcuffs, for thirty minutes. Plaintiff claims that the officers yelled at her, accused her of running a drug house, and told her that it was her fault her dog was dead. The officers refused to show her the warrant to her until they finished the raid. Plaintiff did not seek medical treatment for her alleged injuries.

This case differs in one significant respect from others in which the Sixth Circuit has found the detention of occupants unreasonable—the officers here did not point their guns at Plaintiff. Although Defendant Officers' actions of handcuffing Plaintiff and forcing her to face the wall might have been unnecessary and overly cautious, their conduct was not so unreasonable as to violate clearly established law.

*See Gordon v. Louisville/Jefferson Cnty. Metro Gov't*, 486 F. App'x 534, 543 (6th Cir. 2012). Given the relatively brief length of detention, and the fact that the officers did not have their weapons drawn, neither the use of handcuffs nor the verbal threats during the execution of a search warrant constitute excessive force under the circumstances. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 599 (6th Cir. 2012). Defendant Officers are entitled to qualified immunity on Count IV.

IV. **Malicious Prosecution (Count V)**

Plaintiff alleges a state law claim of malicious prosecution against Defendant Officers. To establish a malicious prosecution claim in Michigan, Plaintiff must show:

> (1) the defendant has initiated a criminal prosecution against [her], (2) the criminal proceedings terminated in [her] favor, (3) the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Walsh v. Taylor*, 263 Mich. App. 618, 632–33, 689 N.W.2d 506, 516–17 (2004).

Defendants challenge Plaintiff's malicious prosecution claim on three grounds: first, that Plaintiff cannot show that the criminal proceedings terminated in her favor because the prosecutor dismissed the case without prejudice; second, that none of the named Defendants instituted the criminal action or gave knowingly false information to the prosecutor who charged her; and third, that Defendants had

probable cause to arrest Plaintiff for criminal activity based on the marijuana and grinder seized during the raid at her home.

The Court need not resolve the issue of whether the criminal proceedings terminated in Plaintiff's favor. Plaintiff's malicious prosecution claim fails because she demonstrates neither that Defendants "knowingly swore to false facts" nor "an absence of probable cause." *See Newman v. Twp. of Hamburg*, 773 F.3d 769, 773 (6th Cir. 2014) (citing *Matthews v. Blue Cross & Blue Shield of Mich.*, 456 Mich. 365, 385, 572 N.W.2d 603, 609-10 (1998)).[2]

**V. *Monell* liability**

To prevail on her municipal liability claim, Plaintiff must show not only that her constitutional rights were violated, but also that the "violation occurred because of [an official] municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Plaintiff can establish the existence of an illegal policy or custom by alleging "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a

---

[2] Plaintiff also seeks leave to amend her complaint to allege a federal malicious prosecution claim. Although the Sixth Circuit recognizes a "constitutionally cognizable claim of malicious prosecution," *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010), adding this claim to the Complaint would be futile as Plaintiff has failed to establish a lack of probable cause underlying the criminal proceedings.

policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478 (internal citation omitted).

Plaintiff proceeds only on an inadequate training theory. Failure to train may serve as the basis for § 1983 municipal liability where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Brown*, 814 F.3d at 463 (internal quotation marks omitted). To demonstrate deliberate indifference, Plaintiff must show "prior instances of unconstitutional conduct demonstrating that the [City] . . . ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010) (internal quotation marks omitted).

There appear to be two bases underlying Plaintiff's failure to train theory. The first, which can be easily rejected, is that the City has been deliberately indifferent to the unconstitutional ways in which its officers obtain and execute search warrants. Because Plaintiff has failed to offer any evidence to establish that Defendants lied to obtain the search warrant in violation of her constitutional rights, she cannot succeed on this claim. *See Bateman v. Driggett*, No. 11-13142, 2012 WL 2564839, at *9 (E.D. Mich. 2012) (citing *Miller*, 606 F.3d at 254-55).

The second, which requires more thorough consideration, is that the City's failure to train its officers on how to secure animals during the execution of search warrants amounts to deliberate indifference towards citizens' Fourth Amendment rights to be free from unreasonable seizures of their dogs.

DPD's written policy on the use of force against animals provides:

> The use of physical force against any animal will be used only to the extent that such force is necessary to prevent harm or injury to another person(s) or animal(s). An officer shall not discharge a firearm at a dog or other animal, except to protect a member or person from imminent physical injury and there is no opportunity to retreat or other reasonable means to eliminate the threat. Before using deadly force, every attempt will be made to use other reasonable means to contain the threat of a dangerous animal . . . . In any instance where a member discharges a firearm at an animal with the intent to destroy, whether the animal is hit or missed, the officer's supervisor shall prepare a Destruction of Animal Report.

Defs.' Supp. Ex. 1, § 304.2–4.7.

The record does not clarify the training DPD officers receive on how to execute this written policy. Pionessa testified that, each year, the City offers a "40-hour update class," and "believe[s] a class touched on police-involved shooting up dogs." Samuel Pionessa Dep. 76:16-18, Apr. 12, 2018.

Although the policy requires that supervisors prepare Destruction of Animal ("DOA") reports to document officers' conduct and assess the effectiveness of the officers' training, these reports may contain unreliable information. Pionessa testified that when he prepares DOAs, he includes "the facts and circumstances that

led to the dog being shot;" but when it comes to filling in the section of the DOA report which lists the number of dogs the officer has shot in the past, "the only way [he] can go off is the officer telling [him] and he start[s] from there." *Id.* at 79:15-23. In other words, other than relying on the shooting officer's word, DPD has no way to track the number of dogs a particular officer has fatally shot.

The Major Violators Crew, the team who raided Plaintiff's home, conducts approximately nine to twelve raids per week. Prior to June 2, 2017, Defendant Galloway, a member of the Crew, had killed at least 18 dogs. Moreover, DOA reports dated January 2015 through July 2016 indicate that other non-party DPD officers have killed far more dogs than Galloway, including non-party William Morrison who, alone, has killed at least 68 dogs.

Documentation concerning the number of dogs killed before January 2015 and after July 2016 has not been presented to the Court. To the extent that the DOA reports record DPD officers' conduct during this 18-month period, Pionessa's testimony gives this Court reason to question the reports' accuracy.

With this in mind, the Court turns to the question of the City's liability. The number of raids executed, coupled with the remarkably high number of dogs killed, leads this Court to believe that the City had "notice that [] training in this particular area was deficient and likely to cause injury." *Miller*, 606 F.3d at 255.

Nonetheless, Plaintiff cannot survive summary judgment on her *Monell* claim because she has failed to establish that the prior dog shootings, albeit numerous, were unconstitutional. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal citation omitted) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."). In *Brown*, the Sixth Circuit held that "numerous instances of animal deaths resulting from officer shootings during searches" and the fact "that officers face animals frequently," do not "demonstrate prior instances of unconstitutional conduct" for purposes of establishing municipal liability. 844 F.3d at 575; *see also Robinson*, 818 F.3d at 12 (declining to hold the city liable despite "the risk that officers would encounter dogs during home searches and that some of those encounters would result in unnecessary shootings.").

As this Court previously explained:

> Although Plaintiffs contend that their failure-to-train claim "is bolstered by the incredibly high percentage of search warrants that include Detroit police breaking down people's doors, and the callousness and indifference of Detroit police officers in general," they have provided no information whatsoever about these alleged illegal searches and/or the deliberate indifference of Detroit police officers. (Compl. ¶ 129). Moreover, Plaintiffs have not established any evidence of a pattern of violations by Detroit police . . . .

*Bullman v. City of Detroit*, No. 16-12581, 2018 WL 1088074, at *9 (E.D. Mich. Feb. 28, 2018). In *Bullman*, this Court considered, and rejected, a similar claim for municipal liability. In light of the fact that Plaintiff has failed to identify prior DPD

dog shootings that have been declared unconstitutional, this Court cannot find that the City has ignored a history of abuse for purposes of *Monell* liability.

### CONCLUSION

For the reasons explained above, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment [31]. This ruling has the effect of dismissing Counts III-VI and dismissing Defendants City of Detroit, Nico Hurd, Samuel Pionessa, and John Doe Supervisor. Remaining in this action is Count II against Defendant Samuel Galloway.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment [31] is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Counts III, IV, V, and VI are **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendants City of Detroit, Nico Hurd, Samuel Pionessa, and John Doe are **DISMISSED**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: March 11, 2019     Senior United States District Judge